**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  10-20638-CR-UNGARO/SIMONTON**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**

**DENZIL ROY MONTAGUE, JR.,**

       **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

       Presently pending before the Court is Defendant's Motion to Suppress (DE # 31). This motion is referred to the undersigned Magistrate Judge (DE # 33).  The Government has responded in opposition (DE # 37).  An evidentiary hearing was held on July 20, 2010.  At the conclusion of the hearing, the undersigned Magistrate Judge orally announced her tentative findings of fact and conclusions of law, stating that she was inclined to recommend that the Motion be denied.  The parties were also informed that they would have to order a transcript of the hearing if they intended to file objections. For the reasons stated below, after careful consideration of the testimony and the applicable law, the undersigned recommends that the Motion be DENIED.

       I.      **BACKGROUND**

       Defendant Denzil Roy Montague is charged in a one-count Indictment with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (DE # 15).  The firearm and ammunition which forms the basis for this Indictment was seized on May 1, 2010 from Defendant's person, while Defendant was present in the breezeway outside the Quality Inn Hotel located at 14500 South Dixie Highway in Miami, Florida.  This evidence is subject of the present Motion to Suppress,

in which Defendant contends that the investigatory stop and search of his person for a handgun was unlawful (DE # 15).

II.     **THE MOTION TO SUPPRESS**

Defendant challenges the legality of the investigatory detention and search of his person for a handgun and the subsequent seizure of the loaded handgun found on his person (DE # 31).  Specifically, relying primarily on *Regalado v. State*, 25 So. 3d 600 (Fla. 4th Dist. Ct. App. 2010), Defendant contends that the police had no right under the Fourth Amendment to conduct a pat-down search for a weapon, even though the hotel security guard had told the police that Defendant was in possession of a handgun, because the police had no reasonable suspicion of criminal activity, as they did not know whether Defendant had a concealed weapons permit.  Defendant contends that it is not illegal to possess a concealed handgun in Florida unless the possessor has not obtained a concealed weapons permit; and, that at the time of the search the police had no information regarding whether Defendant had such a permit.  In addition, at the hearing, Defendant contended that the investigatory detention and search could not be justified as part of an investigation of disorderly conduct or intoxication, or breach of the peace, since the police did not have facts to establish a reasonable suspicion that Defendant had committed this offense.  Defense counsel clarified at the hearing that Defendant does not challenge the reliability of the informant/hotel security guard; rather, he contends that the information in the possession of the police at the time of Defendant's search was insufficient to justify an investigative detention and frisk for weapons under the parameters of *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny.

In opposition, the Government argues that the police lawfully stopped and searched Defendant for a firearm because they possessed reasonable suspicion that

2

Defendant had engaged in or was about to engage in illegal activity.   Specifically, the government argues that the police had information from a reliable informant, Jorge Medina, the supervising hotel security guard, who was previously known to Miami-Dade Police Department Officer Fidel Rubido, that Defendant was acting "improperly" in the hotel and  possessed a firearm in his back pocket.  Moreover, when Officer Rubido arrived at  the Quality Inn, the security guard identified Defendant as the person he had called about.  Defendant then interrupted the conversation between  Rubido and Medina by talking loudly and in a rambling manner to Rubido, saying he could pay, and by displaying his credit cards and his wallet to Rubido.  The Government argues that these facts, taken together, provided the police officers with reasonable suspicion to investigate Defendant for breach of the peace, disorderly intoxication, and carrying a concealed weapon, and they were permitted to make an investigatory stop and search of Defendant for weapons (DE # 37).

     III.    **THE EVIDENTIARY HEARING**

        A.    **Introduction**

At the evidentiary hearing, the Government called as witnesses Miami-Dade Police Officers Fidel Rubido and Alex Castillo.  The Government also introduced into evidence the following four exhibits: GX 1 and GX 2 are photographs of the breezeway of the Quality Inn, the area where Defendant was patted down; GX 3 is a photograph of the firearm seized from Defendant, as well as a subsequently discovered cigarette box and packet of cocaine, which subsequently were seized from Defendant during a continued frisk after he was handcuffed following the discovery of the firearm; and GX 4 is a photograph of Defendant in the back of Officer Rubido's car after he had been taken into custody.  Defendant did not call any witnesses and introduced into evidence one exhibit,

DX 1, which is a recording of the call to dispatch which Officer Rubido made on his way to the Quality Inn.

The undersigned Magistrate Judge finds credible the testimony of the Government's witnesses regarding the events which led to the investigatory stop and search of Defendant.  As announced at the conclusion of the hearing, based upon the forthright, plausible and mostly consistent testimony of the police officers, the undersigned credits the testimony of the Government's witnesses regarding the relevant events.  Insofar as the testimony of the officers is not completely consistent, the undersigned finds that the minor differences in their testimony does not affect the finding that their testimony was credible.  The Findings of Fact set forth below in Part B of this Section are based on this credibility determination.  Moreover, the critical facts are undisputed; the primary dispute concerns the inferences to be drawn from those facts and whether those facts establish reasonable cause to support the investigative detention and search for weapons.

B.    Findings of Fact[1]

In the early morning hours of May 1, 2010, Officers Fidel Rubido and Alex Castillo of the Miami-Dade Police Department ("MDPD") were on patrol in the Palmetto Bay area of Miami-Dade County in separate marked MDPD patrol cars.  Each officer was driving alone and was dressed in the standard MDPD uniform, which includes brown pants, a tactical belt, and a brown shirt that prominently displays the officer's police badge.  The officers were each working a shift from 10:00 p.m. on April 30, 2010 to 6:00 a.m. on May 1, 2010.

---

[1]  To the extent that these Findings of Fact are more properly characterized as Conclusions of Law, and vice versa, the undersigned intends that they be treated as such.

At approximately 1:00 a.m., Officer Rubido received a telephone call on his personal cell phone from Jorge Medina, a supervising security guard who worked at the Quality Inn Hotel, located at 14500 South Dixie Highway.  Medina told Rubido that there was an unknown male at the hotel who was acting in an improper manner, had a lot of money and was carrying a gun.  Rubido thought that Medina sounded concerned about the situation during the conversation, and believed the information was reliable.[2]  Based upon his prior dealings with Mr. Medina, Officer Rubido understood that by using the word "improper," Medina meant that the person was acting in a disorderly manner and was "causing some kind of disturbance in the hotel."  Officer Rubido did not, however, receive any further specific factual description of what was occurring, other than that the gun was in the person's back pocket.

After Officer Rubido received this telephone call, he contacted the MDPD radio dispatcher and reported his intention to investigate the situation.  As stated on the recording of this call (DX 1), Rubido requested a back-up officer to meet him at the Quality Inn because there was "somebody walking around with a gun in their back pocket."  The dispatcher requested that back-up units respond to the Quality Inn.  Officer Alex Castillo answered this request and proceeded to the hotel.  Within minutes, as described below, both officers arrived at the hotel.  They were both armed and dressed in police uniforms, but neither officer drew his weapon at any time during the ensuing

---

[2] Officer Rubido and Medina had met on several occasions when Rubido had been patrolling the area surrounding the Quality Inn.  Rubido had provided Medina with his personal cell phone number in the event Medina observed any suspicious behavior occurring at the hotel.  Medina had previously called Rubido on a few occasions to report vandalism, trespassing, and people causing disputes at the Quality Inn.  The information provided by Medina in the past had always been reliable.  Rubido had also given his personal cell phone number to the owner of a gas station on his route and to a security guard who worked at a mall on Rubido's route.

encounter.

Officer Rubido arrived first, parked his car, and walked towards the hotel lobby. As Rubido approached the hotel, he noticed Medina and another security guard standing in the breezeway of the hotel talking to Defendant.  Defendant was dressed in a black t-shirt and black shorts.  When Rubido arrived at the breeze-way, Medina immediately explained to Rubido in Spanish that this was the man with the gun.

Defendant interrupted the conversation between Officer Rubido and Medina. Rubido then asked Defendant what he was doing at the hotel.  Defendant was talking fast, appeared anxious and jittery and was acting aggressively, with his arms waving. He was sweating and his eyes were glassy, watery and red.  Defendant then provided a loud, rambling response, said he could pay and took out his wallet to show Rubido what appeared to be credit cards.  Rubido did not know if Defendant was under the influence of alcohol or drugs, but in his opinion, Defendant was not acting normally.  At this time, Officer Castillo arrived and approached Defendant from behind.

Once Officer Castillo arrived, the officers asked Defendant to lift up his shirt and turn around.  Defendant did not do so when first asked, but when told again to lift his shirt by Officer Rubido, he lifted his shirt with both hands in an aggressive manner, and swore.  Rubido did not see anything in the front of Defendant's waistband, and told Defendant to turn around.  Defendant then turned to his left.  At that time, Defendant appeared upset, aggravated and agitated and acted antagonistic. Castillo immediately observed what appeared to be a firearm in the right rear pocket of Defendant's shorts. Castillo quickly grabbed Defendant's right arm, reached into Defendant's pocket and retrieved the gun, a small caliber semi-automatic, and yelled, "GUN."

Immediately after retrieving the gun, Officer Rubido asked Defendant if he had a

6

license to carry a concealed weapon.  Defendant did not respond, and he was then handcuffed and placed on the hood of a car parked in the breezeway.[3]  Before placing Defendant in the marked patrol car, the officers next conducted a search of Defendant for more weapons.  There was a hard cigarette box in Defendant's right front pocket, which was removed to determine if it contained a razor blade or other weapon.  The box had a cellophane wrapper, and between the cellophane wrapper and the outside of the box was a small baggie containing a white powdery substance that appeared to be cocaine.[4]  The officers also removed a wad of cash from Defendant's right front pocket to determine if there were any weapons concealed under or behind the currency. Defendant was in possession of approximately $3,200.00, including the money that was in his wallet.  A later field test of the white powdery substance was positive for the presence of cocaine.  During the pat-down search, Officer Castillo noticed a smell of alcohol coming from Defendant.

The officers then secured Defendant in the back of Officer Rubido's police car. The firearm discovered by the officers was a .22 caliber short Berretta pistol, Model 950, serial number C40554, which was loaded with four rounds of ammunition.  A subsequent records check showed that Defendant had been previously convicted of a felony offense, and was therefore not permitted to possess a firearm.  Rubido then called the Federal Bureau of Alcohol, Tobacco and Firearms, who arrested Defendant on the presently pending charges.

---

[3]  The location of the car is depicted in GX 1.

[4]  GX 3 depicts the cocaine baggie between the cellophane wrapper and the hard cigarette box.

IV.    **CONCLUSIONS OF LAW AND LEGAL ANALYSIS**

A.    **Framework for Analysis**

The determination of whether a search and/or seizure is lawful under the Fourth Amendment to the United States Constitution is governed by federal law.  This is true regardless of whether the search was conducted by state officers, or whether the crime under investigation was a state or federal offense.  *See, e.g.*, *United States v. Bembry*, 321 Fed. Appx. 892, 894 (11th Cir. 2009), *quoting United States v. Clay*, 355 F.3d 1281, 1283 (11th Cir. 2004) ("[T]he admissibility in federal court of the products of state searches and seizures is controlled by federal law.").  Moreover, as stated by the United States Supreme Court in *Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001), a state court is not permitted to "interpret the United States Constitution to provide greater protection than this Court's own federal constitutional precedents."

In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court established that a law enforcement officer who has a reasonable and articulable suspicion that criminal activity is afoot is permitted to conduct a brief investigatory stop even in the absence of probable cause.  Thus, it is well-settled that "law enforcement officers may briefly detain a person for investigative purposes if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity.  *Terry v. Ohio*, 392 U.S. 1 (1968)."  *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220 (11th Cir. 1993).  *Terry* specifically states that an officer may conduct a frisk or pat down of an individual in order to conduct a limited search for weapons "where he has reason to believe that he is dealing with an armed and dangerous individual.  *Terry v. Ohio*, 392 U.S. at 27, *see also Minnesota v. Dickerson*, 508 U.S. 366 (1993).

8

In evaluating the reasonableness of the stop, not only must the court examine the reasonableness of the stop at its inception, but also whether the continued detention was reasonably related in scope to the circumstances which justified the initial stop; *i.e.* "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  Stated another way, the test to determine whether a stop and the continued detention are reasonable within the meaning of the Fourth Amendment "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985).  Moreover, even though each of the acts relied upon to support the existence of reasonable suspicion may be susceptible of innocent interpretation, they may collectively amount to reasonable suspicion based upon the experience of the officer.  *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002).  To establish reasonable suspicion, the specific facts supporting the investigative stop need not be based solely on an officer's personal observations, but rather may be based on information supplied by another person, so long as the information bears "sufficient indicia of reliability." *See Alabama v. White*, 496 U.S. 325, 330 (1990); *accord United States v. Fields*, 178 Fed.Appx. 890, 893 (11th Cir. 2006).  The veracity of an identified private citizen informant, like Medina, as opposed to a paid or professional criminal informants, is generally presumed in the absence of special circumstances suggesting that the identified private citizen informant should not be trusted.  *United States v. Elmore,* 482 F.3d 172, 180, 183 (2d Cir. 2007), *citing Caldarola v. Calabrese,* 298 F.3d 156, 165-66 (2d Cir. 2002); *United States v. Rollins,* 522 F.2d 160, 164 (2d Cir. 1975) (noting the peculiar likelihood of accuracy of a citizen informant's report).  Moreover, an informant is more reliable if he,

9

like Medina, meets with the police face-to-face because he runs a greater risk that he will be held accountable if his information proves false.  *Elmore,* 482 F.3d at 180-81, 183 (2d Cir. 2007), *citing United States v. Salazar,* 945 F.2d 47, 50-51 (2d Cir. 1991).

It is axiomatic that when a police officer receives reliable information from a known and reliable private citizen informant that another individual is in possession of a concealed firearm, the police officer has reasonable suspicion to conduct a *Terry* stop-and-frisk of the individual suspected of having a gun.  *See United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (a contemporaneous, specific, and detailed tip that the defendant had a gun and was present at a specific location provided reasonable suspicion to detain the defendant for a *Terry* stop), *citing Adams v. Williams*, 407 U.S. 143, 144-48 (1972) (a police officer had reasonable suspicion for a *Terry* stop of the defendant when a reliable individual gave him a tip that the defendant was sitting in a parked car carrying narcotics and with a gun at his waist).  *Accord United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000) (*Terry* stop upheld where a resident informed police that individuals in house located two doors down possessed guns and drugs).

In this regard, the undersigned rejects the reliance placed by Defendant on *Regalado v. State*, 25 So. 3d 600 (4th Dist. Ct. App. 2010).  Defendant accurately argues that under *Regalado* a police officer may not frisk a defendant for weapons based on a tip from a person who approached the officer and stated that an individual had a gun, even when coupled with the fact that the officer saw a bulge in that individual's waistband that looked like a gun.  The Court in *Regalado* held that  "no facts and circumstances were presented to show that Regalado's carrying of a concealed weapon was without a permit and thus illegal" and therefore the "officer had no reasonable suspicion of any criminal activity."  *Id.* at 604.  Thus, the Court held that the seizure of

10

the weapon was unlawful, and the defendant's conviction for carrying a concealed firearm was reversed.

*Regalado*, however, is contrary to the law of at least two other District Courts of Appeal in Florida.  For example, in *United States v. Burgos*, 994 So. 2d 1212 (Fla. 5th Dist. Ct. App. 2008), the Court held that where officers investigating an anonymous  tip approached the defendant, who admitted that he was carrying a concealed firearm, the officers had probable cause to seize the weapon.  At that point, the officers properly instructed the defendant to raise his hands and seized the weapon.  The Court expressly rejected the defendant's argument "that his admission that he was carrying a firearm did not support a reasonable suspicion that he was committing a crime."  The Court stated: "Although some citizens do have the right to carry concealed firearms lawfully, the vast majority do not.  Reasonable suspicion and probable cause are based on probabilities, not absolute certainty.  It is not necessary that police allow an individual to continue in possession of a firearm while they confirm the suspected crime to an absolute certainty."  994 So. 2d at 1214.

The Third District Court of Appeal of Florida reached the same conclusion in an *en banc* opinion in *State v. Navarro*, 464 So. 2d 137 (Fla. 3d Dist. Ct. App. 1985).  There, the *en banc* Court adopted the dissenting opinion from a panel decision that had affirmed a motion to suppress a firearm seized from the defendant.  There, the police officer observed a bulge under the defendant's jacket, which appeared to the officer to be the butt of a gun.  At that point, the officer frisked the defendant, felt the gun and removed it.  In determining that this seizure was constitutionally permissible, the Court stated: "The police officers' observation of the outline of a firearm amounted to *probable cause* to believe that [the defendant] was carrying a concealed weapon, justifying not

merely a pat-down, but a search."  464 So. 2d at 139 (emphasis in original).

The opinions of the Fifth and Third District Courts of Appeal of Florida are more persuasive than the opinion of the Fourth District Court of Appeal in *Regalado*.  Although the Third District Court of Appeal did not address the possibility of a concealed weapons permit, as Defendant in the case at bar recognized at oral argument, the absence of a concealed weapons permit is not an element of the offense.  Rather, it is an affirmative defense.  Florida law obviously governs the elements of state offenses.  The crime of Carrying a Concealed Weapon is defined in Fla. Stat. § 790.01(2), which provides "[a] person who carries a concealed firearm on or about his person commits a felony of the third degree").  The Standard Jury Instructions promulgated by the Florida Supreme Court, as well as the relevant caselaw make it clear that the absence of a permit is not an element of the offense.  Jury Instruction 10.1 of the  Florida Standard Jury Instructions in Criminal Cases states that to prove the crime of carrying a concealed firearm, the State must prove two elements beyond a reasonable doubt:

> 1.  Defendant knowingly carried on or about his person (the weapons alleged).
>
> 2.  The (weapon alleged) was concealed from the ordinary sight of another person.

*See Watt v. State*, 31 So.3d 238, 239, 242 (Fla. Dist. Ct. App. 2010) (the state does not have the burden of proving the absence of a license as an element of the crime of carrying a concealed weapon, rather, proof of a license is only pertinent as an affirmative defense).

Moreover, Fla. Stat. § 790.02 states:

> The carrying of a concealed weapon is declared a breach of the peace, and any officer authorized to make arrests under the laws of this state may

12

> make arrests without warrant of persons violating the provisions of s. 790.01 when *said officer has reasonable grounds or probable cause to believe that the offense of carrying a concealed weapon is being committed*.

(Emphasis added). *See also West v. State*, 239 So.2d 611, 612-13 (Fla. Dist. Ct. App. 1967); *Marden v. State*, 203 So.2d 638, 640 (Fla. Dist. Ct. App. 1967); *Haynes v. State*, 72 So.2d 180, 184 (Fla. 1916); *Carlton v. State*, 58 So.2d 486, 488-89 (Fla. 1912).[5]

Thus, the undersigned concludes that where officers have a reasonable, articulable suspicion based on objective facts that a person is carrying a concealed firearm, they may approach that person and conduct a pat-down search, or frisk, for weapons while they further investigate that crime.

In addition to the offense of carrying a concealed weapon, the Government in the case at bar also contends that there was reasonable suspicion to support an investigative detention with respect to other offenses, specifically disorderly intoxication, in violation of Fla. Stat. § 856.011, and Breach of Peace, in violation of Fla.

---

[5] Defendant also cited *United States v. Ubilies*, 224 F.3d 213 (3d Cir. 2000) and *Georgiacarry.org, Inc. v. Metro. Atlanta Rapid Transit Auth.*, No. 1:09-CV-594-TWT, 2009 WL 5033444 (N.D. Ga. Dec. 14, 2009) to support the proposition that an officer who knows only that a person is carrying a concealed firearm does not have sufficient facts to establish reasonable suspicion of criminal activity. However, as explained in *Georgiacarry.org*, this rule has only been applied where an element of the offense is the lack of a permit or license to carry a firearm. In fact, in *Gerogiacarry.org*, the Court expressly held that since under Georgia law possession of a firearms license was an affirmative defense, it did not matter if there was no reason to suspect that the person did not have a firearms license. Contrary to Defendant's assertion, the decision was not based upon the contention that the law prohibited carrying a firearm on public transportation. In this regard, the Court distinguished *Ubilies*, which invalidated a stop where there was no reason to believe the person had no license since, under the applicable law of the Virgin Islands, the failure to have a license was an element of the offense. *Georgiacarry.com* at *6. *Accord United States v. Gatlin*, 2010 WL 2778691 at *2 (3d Cir. 2010) (finding that a tip from a reliable informant that an individual meeting the defendant's description was carrying a concealed handgun and was walking in the area stated by the informant provided reasonable suspicion that the defendant was carrying a concealed handgun without a license, and supported a *Terry* stop of the defendant at gunpoint); *United States v. Cooper*, 293 Fed. Appx. 117 (3d Cir. 2008).

13

Stat. § 877.03.

The offense of Disorderly Intoxication is set forth in Fla. Stat. § 856.011(1), which provides that "[n]o person in the state shall be intoxicated and endanger the safety of another person or property, and no person in the state shall be intoxicated or drink any alcoholic beverage in a public place ... and cause a public disturbance."  The elements of this offense are (1) that the defendant is intoxicated; and, (2) that the public safety is endangered.  *State v. Holden*, 299 So. 2d 8 (Fla. 1974); *Jernigan v. State*, 566 So. 2d 39 (Fla. Dist. Ct. App. 1990).

The offense of Breach of the Peace; Disorderly Conduct, is set forth in Fla. Stat. § 877.03, which provides, "Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree."

Although broadly written, as argued by Defendant in the case at bar, the offense of Breach of the Peace has been limited by the Florida Supreme Court.  In *State v. Saunders*, 339 So.2d 641, 644 (Fla.1976), the Court held:

> [W]e now limit the application of Section 877.03 so that it shall hereafter only apply either to words which "by their very utterance ... inflict injury or tend to incite an immediate breach of the peace," or to words, known to be false, reporting some physical hazard in circumstances where such a report creates a clear and present danger of bodily harm to others.  We construe the statute so that no words except "fighting words" or words like shouts of "fire" in a crowded theatre fall within its proscription, in order to avoid the constitutional problem of overbreadth, and "the danger that a citizen will be punished as a criminal for exercising his right of free speech." With these two exceptions, Section 877.03 should not be read to proscribe the use of language in any fashion whatsoever.

14

**B.**     **The Investigative Detention and Frisk of the Defendant Was**
            **Supported by Reasonable Suspicion of Criminal Activity**

There is no question that when Officer Rubido arrived at the Quality Inn the initial

encounter with Defendant was consensual in nature.  During that encounter, if not

before, there was reasonable suspicion that Defendant had committed the offense of

carrying a concealed firearm.  The specific and articulable facts to support this

conclusion consist of the information received from security guard Medina, a known and

reliable private citizen, that Defendant was carrying a gun in his back pocket and was

acting improperly, *i.e.*, in a disorderly manner.  Medina was a reliable individual,

previously known to Officer Rubido, who had previously reported to Rubido incidents of

trespassing and vandalism at the Quality Inn.  Thus, before Rubido arrived at the hotel, a

known, reliable individual who was a security guard at the hotel had told him, sounding

concerned, that there was an unknown male at the hotel who was acting improperly, was

carrying a lot of money and was carrying a firearm.

When Officer Rubido arrived at the hotel, he had a chance to speak to Medina

face-to-face, who immediately told Rubido that Defendant was the man he had called

about.  Rubido then personally viewed Defendant behaving oddly and aggressively.

First, Defendant interrupted the conversation between Medina and Rubido.  Then, when

Rubido asked Defendant what he was doing at the hotel, Defendant provided a loud,

rambling response, said he could pay, and took out his wallet to show Rubido what

appeared to be credit cards.  Officers Rubido and Castillo observed that Defendant was

talking fast and appeared anxious and jittery and was acting aggressively, with his arms

waving.  His eyes were glassy, watery and red, and he was sweaty.  Thus, Defendant's

actions confirmed Medina's information that Defendant was acting improperly.

The officers' confirmation of Medina's statement that Defendant was acting

improperly, made by their personal observation and interaction with Defendant, combined with Medina's statement that Defendant was carrying a gun, certainly warranted further investigation.  Since credible information established that the defendant was carrying a firearm concealed in his back pocket, under *Burgos* and *Navarro*, there was at least reasonable suspicion that Defendant was committing the crime of carrying a concealed firearm, as defined by Florida law.  The officers then took the reasonable, minimally intrusive step of asking Defendant to raise his arms, which had the effect of lifting Defendant's shirt so that his back pocket was in view.  The actions of the police in ordering Defendant to raise his arms, and then to turn around, raised the encounter from consensual to an investigative detention.  At that point, according to the unequivocal and credible testimony of Officer Castillo, he saw the outline of a firearm in Defendant's pocket.  He confirmed it was a firearm by patting it, and then retrieved the weapon from Defendant's pocket.

As soon as the gun was retrieved, Officer Rubido asked Defendant if he had a concealed weapons permit, and received no response.  Florida law requires that the owner of a such a permit must have it in possession at all times when in actual possession of a concealed firearm, and must display the license upon demand by a law enforcement officer.  Fla. Stat. § 790.06.  The mere discovery of a concealed weapon is sufficient to establish probable cause to support an arrest; however, here, the failure of Defendant to respond to questioning regarding the concealed weapons permit provides even stronger evidence of the crime.  At that point, Defendant was properly handcuffed and placed against the car, where a further search occurred.  Since there was probable cause to arrest Defendant, a full scale search was permitted at that point, even though the formal arrest did not occur until later.  *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980);

*United States v. Goddard*, 312 F.3d 1360, 1364 (11th Cir. 2002). [6]

Therefore, the undersigned concludes that the temporary detention and frisk of Defendant Montague was constitutionally permissible, that the investigative detention was reasonable in duration and scope, and led to the lawful seizure of the firearm.  At that point, there was probable cause to arrest Defendant for carrying a concealed firearm, and it was also permissible to continue the investigation to determine that he was a convicted felon.[7]

V.   CONCLUSION

Based upon the foregoing Findings of Fact and Conclusions of Law, the undersigned hereby

RECOMMENDS that the Motion to Suppress (DE # 31) be DENIED.

The parties will have fourteen days from the date of entry of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned.  Any objections must include a copy of the hearing transcript.  Failure to file objections timely shall bar the parties from attacking on appeal

---

[6] Based upon the above analysis, it is not necessary to determine whether there were sufficient facts to warrant a temporary detention to investigate the other offenses. However, the undersigned notes that the police would likely be derelict in their duties if they did not respond to a call for assistance from a hotel security guard who claimed that an individual was creating a disturbance and carrying a weapon, and that such response should reasonably include interviewing the person allegedly creating a disturbance.  Since the disturbance involved the possession of a weapon, it also seems reasonable to disarm that individual during the course of the investigation, particularly in view of the behavior exhibited by Defendant in the case at bar.  Although there was clearly not probable cause to arrest Defendant for either disorderly conduct or disorderly intoxication, it appears that there was sufficient information to establish the reasonable suspicion necessary to justify the minimally intrusive step taken here of a temporary investigative detention.

[7] Defendant has not challenged the length or circumstances of the detention, other than the determination of whether facts establishing mere possession of a concealed weapon are sufficient to warrant a temporary investigative detention.

any factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988);

*RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

     **DONE AND SUBMITTED** in Miami, Florida, on July 27, 2010.


                                *Andrea M. Simonton*
                                **ANDREA M. SIMONTON**
                                **UNITED STATES MAGISTRATE JUDGE**

**Copies furnished via CM/ECF to:**
**The Honorable Ursula Ungaro, United States District Judge**
**All counsel of record**